**UNITED STATES of America,**
**Appellant,**

v.

**John B. BEARD and Helen B. Beard,**
**Appellees.**

**No. 15560.**

United States Court of Appeals
Ninth Circuit.

May 26, 1958.

Rehearing Denied July 8, 1958.

Certiorari Denied Oct. 27, 1958.

See 79 S.Ct. 114.

John N. Stull, Acting Asst. Atty. Gen., Davis W. Morton, Jr., Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., Lloyd H. Burke, U. S. Atty., Lynn J. Gillard, Asst. U. S. Atty., San Francisco, Cal., for appellant.

Hoover, Lacy & Bienvenu, Edward M. Lacy, Robert C. Bienvenu, Francis C. Hoover, Modesto, Cal., for appellees.

Before ORR, FEE and CHAMBERS, Circuit Judges.

ORR, Circuit Judge.

Contending that certain income realized by appellee Beard, hereafter the taxpayer, was realized from sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," within the meaning of 1939 Internal Revenue Code, § 117(a) (1), 26 U.S.C.A. § 117(a) (1), the Commissioner made deficiency assessments in the sum of $36,519.29 plus interest, for the taxable years 1946 through 1950.

■ Taxpayer paid the deficiencies and brought suit in the trial court for its recovery. Findings were made and judgment entered in favor of appellees. In disposing of the questions posed on this appeal we are confronted solely with a question of fact "which ordinarily is governed by the findings of the trial court, unless these are clearly erroneous or unless an appellate court is convinced by an examination of the entire record that a mistake has been committed." Bistline v. United States, 9 Cir., 260 F.2d 77, 78. "Cases of this character present difficulties because there is no agreement among the courts as to what primary element in the transaction determines its character." Pool v. Commissioner, 9 Cir., 1957, 251 F.2d 233, 235.

We turn now to a statement and consideration of the facts. Taxpayer's forebears located in Modesto, California in 1850 and some of the descendants have since engaged in large farming operations, as well as branching out into other allied businesses in the area. The Beard family group now consists of 10 brothers and sisters, each of whom is a 10% stockholder and director in each of seven family corporations. In 1950 these companies included: the Beard Land and Investment Company (hereafter L & I), a family holding company which also conducts extensive farming and business property operations; a short-line railroad; an ice, fuel and appliance business; a farming enterprise; a large public utility water company; and the Modesto Refrigerating Company, a large cold storage and quick freezing concern.

Taxpayer was president and general manager of the refrigerating company from 1926 until its sale in 1953. The concern had an ice making and car-icing facility, sold ice to consumers and to packers for pre-cooling, had a quick-freeze plant for fruit, vegetables and turkeys with a 300,000 lb. daily capacity, and a cold storage warehouse with custom freezing for packers which had a storage capacity of 600 car loads. The family investment in the company was almost doubled by expansion of the plants in 1946 and in 1949–1950 a further increase of $300,000 to $400,000 was made, resulting in a total investment of nearly $2,000,000. By 1950, the last tax year in question here, gross sales were over $1,000,000. Depending upon the time of year, the concern employed from 75 to 125 workers, all of whom were under active supervision of taxpayer.

The five years 1946–1950 were those in which the greatest growth occurred in all the family concerns. Three brothers were the active heads of all the businesses, with the other owners taking little active part in the operations. In addition to his job at the refrigerating

company, taxpayer had over-all supervision of City Ice and Fuel Company, and he occasionally dropped in on other family businesses, particularly the railroad. He had no other office than the one at the refrigerating company, and customarily was there from 8 or 8:30 to 5:30 or 6 "with getting out during the day." He testified that he spent something like one to five per cent of his time on his real estate properties, but this time came "somewhere out of a 24 hour day."

A summary of taxpayer's real estate activities and interests follows:

In 1932 taxpayer made his first purchase of land which was later subdivided, the 12 acre Las Palmas tract of 40 lots. By 1936 the city limits ran along one edge of the tract. The first sales were made in 1936 or 1937 and at that time an adjacent tract was also for sale by others. Sales by taxpayer were handled through a Mr. Hopkins, a real estate agent, and he sold 30 lots by 1941, all but two of the 40 being sold by that time.

The first tract purchased by taxpayer which produced income during the taxable years now in question was the Wilson No. 1 tract of 25 acres, adjacent to Las Palmas and 600 feet from the city limits at the time of purchase in 1937. It had been platted for subdivision by the former owners in 1924. Taxpayer had a 50% interest in the property, with two of his sisters. The first sale of a lot was within a year of acquisition, in 1938, and the last was in 1948. Hopkins again was the exclusive agent on a commission basis until 1942, but taxpayer sold a few lots himself to close friends without any solicitation on his part. Taxpayer had nothing to do with Hopkins' sales other than to sign the deeds, but admitted he had discussions with him about ideas to carry on sales and during 1941–1942 even helped him out on some of the advertising. There were no sales during the war and in 1945 L & I began handling the property. Taxpayer built four houses on this tract in 1940 and all were sold by 1942, some being sold by himself.

In 1939, a year after acquiring Wilson No. 1, taxpayer began buying the farms which made up Wilson No. 2, again taking a 50% interest with two sisters. Other developments were opening up near by at the time, and taxpayer personally secured the three government permits and subdivided the tract in 1940. Roads were put in by L & I and water was put in by the family water company. In 1940 and 1941 taxpayer built 5 houses on this tract and sold all of them by 1942, either himself or through his brokers. As with Wilson No. 1, Hopkins was the sales agent until 1942, with taxpayer making a few sales at that time himself. Hopkins made all the contacts and handled all the details on sales he made. In 1945 L & I became the exclusive sales agent and thereafter, taxpayer testified, he had nothing to do with the operation as to advertising, soliciting or making improvements.

The third tract from which sales were made in the period in question was Thousand Oaks, a 44 acre tract taxpayer acquired for himself in 1940. Taxpayer filed the original subdivision map himself. "I done a little preliminary work on it there in 1941 with the idea of going ahead and developing part of it and then had decided to do nothing with it and just let it set there." The tract was divided into 93 lots, and some street work was done and some of the curbs put in by taxpayer directly. L & I handled improvements after 1945 and all lots were sold by L & I between 1946 and 1950.

The 58 acre Covena Park property was purchased in 1940 and 1941. The development was a large over-all subdivision put together by L & I from this and other tracts not owned by taxpayer's family. L & I prepared the necessary legal papers for subdividing, put in all the improvements under its own supervision and made all sales. Taxpayer signed the deeds and L & I deducted expenses from the monthly payments on account to taxpayer. All the 104 lots in this tract were sold quickly, during the 1946–1948 period.

A small area between other tracts already owned by taxpayer, known as Wilson No. 3, was eventually divided into 45 lots. Eight acres were acquired in 1941 and two additional acres to round out the tract were acquired in 1946. Taxpayer held a 50% interest in the property, again with two sisters. When acquired in 1941, the land was probably the closest property to Modesto still available for subdivision. L & I was made the exclusive sales agent in 1945. It put in the streets and the family water company put in the water. Sales began in 1946 and all lots were sold by the end of the year.

The final purchases made by taxpayer during the years in question were in the Alta Vista tract. In 1945 two ranches beyond Covena Park were offered by their owners to L & I. Taxpayer testified that L & I "didn't care to buy it and it was decided—a group of us got together and decided to buy it as individuals." The properties were taken by taxpayer as trustee for a group of seven brothers and sisters, each owning one-seventh. A third ranch of 10 acres was similarly acquired in 1946, making a total of 68 acres ultimately divided up into 215 lots. The sale of lots began in 1946 under L & I direction and most were sold within a two year period: 112 in 1949, and 92 in 1950 (the government figures secured from the county land records were 147 and 115 for each year, respectively). Sale of this property "was very rapid" and only one sale was made after 1950.

After the war, L & I was made the exclusive agent for development and sale of the various properties in which taxpayer had an interest. A fully executed agreement with L & I was introduced with respect to only one tract, the 10 acre Wilson No. 3 property. A copy of a similar agreement bearing only the signature of Walter Beard, president of L & I, was introduced with respect to the 28 acre Covena Park tract in which taxpayer had an interest with this same brother and two sisters. A similar, but undated and unsigned, copy of an agreement was introduced with respect to the 44 acre Thousand Oaks tract owned by taxpayer. No written agreements were introduced for Wilson No. 1 or Wilson No. 2, tracts totalling 47 acres, and none were produced for the Alta Vista trust properties which totalled 68 acres. All agreements that were made were prepared by taxpayer's attorney, the husband of the sister of taxpayer who was secretary of L & I. In the usual agreement L & I was made the exclusive sales agent for five years at a specified commission rate but with the owners retaining power to make sales themselves. Prices were to be fixed by agreement between the owners and L & I, and L & I was to supervise development, deducting its expenses from the monthly remittances to the owners. L & I was to bear the expense of advertising, solicitation and collection.

During the time in question, Walter Beard, president of L & I, had a broker's license and the company operated a real estate department at a separate office in Modesto. It "never ran what I [taxpayer] would say was a very active office," but employed two to four salesmen under direction of a manager, Clyde Oden. According to taxpayer, the office was set up primarily to handle company-owned properties and other properties not owned by taxpayer which the company was selling as exclusive agent. The manager testified that taxpayer's properties were "a very minor part" of the office's operations.

L & I was employed as taxpayer's agent, taxpayer testified, because it was in a position to render a more complete service than any other local agent and it was the most convenient method. The possible profit to L & I, which would eventually accrue in part to taxpayer as a stockholder, was not a consideration because it was "such a minor thing." Nor, according to taxpayer, was L & I retained

because of taxpayer's ability to control its activities as a director, since he testified that his only control was exercised through his interest as owner of the properties. L & I's board of directors met monthly, but taxpayer recalled no discussion of sales of his properties at those meetings. He admitted that following the meetings on occasion the members of the Trust Group which owned the Alta Vista tracts discussed the affairs of their group.

Taxpayer recalled no specific discussions with L & I on how to promote the property, other than those which just developed in the normal course of an agent-owner relationship—very little discussion on sales or method of handling. He did admit that he asked questions and made suggestions on how the properties should be advertised or promoted. The manager of the office testified that he talked to taxpayer very infrequently, possibly four or five times a year in taxpayer's office when he was there to have deeds signed. Taxpayer was always interested in what progress was being made and what steps were being taken, but never came to the realty office itself.

Taxpayer estimated that Modesto's population was around 15,000 in 1941 and about 60,000 at the time of trial, the greatest growth having taken place during the years in question, since 1945. The area of taxpayer's properties was a natural place for subdivision and well adaptable for that purpose. Taxpayer stated that it was not more adaptable than other places around Modesto, though, and that other areas developed at a far faster rate.

According to the government's figures, derived from the county records, 558 lots in which taxpayer held an interest were transferred during the five years in question, the totals for each year being successively, 97, 100, 49, 174, and 138, for the period 1946–1950. Gross sales of real estate in which taxpayer had an interest were:

| | |
|---|---|
| 1946 | $ 95,347.16 |
| 1947 | 62,817.85 |
| 1948 | 54,219.45 |
| 1949 | 148,501.40 |
| 1950 | 125,094.98 |
| Total | $485,980.84 |

In all but one of the five years in question, taxpayer's income from these realty operations was substantially higher than his salary as head of the refrigerating company. Income from real estate operations totalled $126,725.25. His total salary and other non-realty income for these same years was $85,905.20.

It is apparent from the foregoing that taxpayer's interest in the real estate business was large, and it is equally clear that the tracts of land purchased and subdivided were "property held by the taxpayer primarily for sale to customers . . . ." The crucial question presented in the case is whether the holding was for sale "in the ordinary course of his [taxpayer's] business." The trial court found that it was not. In this we think the trial court was clearly in error and that a mistake has been committed.

In order to come within the meaning of trade or business, the purchase and sale of real estate need not be the sole business of a taxpayer. Taxpayer had a large variety of interests in which he was a moving and guiding spirit. The overall picture of the "family enterprises" and taxpayer's association therewith convinces us that the purchase, subdividing, and sale of real estate was sufficiently extensive to bring his activity within the definition of the statute.

While adhering to the rule that each case must be decided upon its particular facts, certain cases decided by this Court are somewhat persuasive. See Bistline v. United States, 9 Cir., 260 F.2d 77; Pool v. Commissioner, 9 Cir., 1957, 251 F.2d 233; Achong v. Commissioner, 9 Cir., 1957, 246 F.2d 445; Stockton Harbor Indus. Co. v. Commissioner, 9 Cir., 1954, 216 F.2d 638; Richards v. Commissioner, 9 Cir., 1936, 81 F.2d 369. And see Fowler v. United States, D.C.N.D. Ohio 1957, 154 F.Supp. 859.

Reversed.