Robert E. AUSTIN and Marian H. Austin, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16097.

United States Court of Appeals Ninth Circuit.

Feb. 9, 1959.

Robert E. Austin, Wendell H. Davis, Los Angeles, Cal., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Loring W. Post, Lee A. Jackson, Melva M. Graney, C. Guy Tadlock, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before BARNES, HAMLIN and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

This case involves deficiencies in income tax returns of petitioners assessed for the years 1950, 1951 and 1952.

The sole question on this appeal is whether certain real estate (vacant unimproved lots) sold by petitioners during the years above stated was held by petitioners primarily for sale to customers in the ordinary course of petitioners' trade or business.

The Tax Court answered the question in the affirmative, holding that petitioners were engaged in the business of selling real estate, and that the gains realized from the sale of such property was subject to taxation as ordinary income. The petitioners contend that the decision of the Tax Court is clearly erroneous, and that the gains realized from the sale of such property are entitled to capital gain treatment under the provisions of Section 117 of the Internal Revenue Code of 1939, as amended. 26 U.S.C. 1952 Edition, § 117. Section 117(a)(1) excludes from the term "capital assets" held by a taxpayer property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Section 117(j) excludes from the definition of property used in the trade or business property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

Ordinarily, whether specified property is held by the taxpayer primarily for sale to customers in the course of his trade or business is a question of fact. Many decisions of this Circuit so testify. Bistline v. United States, 9 Cir., 260 F.2d 77; Bistline v. United States, 9 Cir., 260 F.2d 80; United States v. Beard, 9 Cir., 260 F.2d 81; Pool v. Commissioner, 9 Cir., 251 F.2d 233; Achong v. Commissioner, 9 Cir., 246 F.2d 445; Stockton Harbor Industrial Co. v. Commissioner, 9 Cir., 216 F.2d 638; Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263.

The conclusion, however, that certain property is held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business is subject to reversal if the conclusion is clearly erroneous, or where, on the record as a whole, it is clear that a mistake has been made. Bistline cases, supra; United States v. Beard, supra; Curtis Co. v. Commissioner, 3 Cir., 232 F.2d 167. This Court has never set up formulas of fact as rules of law for this

type of case. Several tests or factors have been considered by the courts to indicate whether certain properties were held by a taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business, such as the nature of the acquisition of the property, the frequency and continuity of sales over an extended period, the nature and the extent of the taxpayer's business, the activity of the seller about the property, and the extent and substantiality of the transactions. In final analysis, however, each case must be decided upon its particular facts, and the presence of any one or more of these factors may or may not be determinative of a particular case. It is rare indeed that one will find any precedent value in applying the decision of one case to the facts of another case. At the most, other cases decided by the courts on this subject may be persuasive or suggestive of the approach of the courts to cases where the facts may be somewhat similar.

■ The facts before the Tax Court in this case are not in dispute. The controversy arises as to the proper conclusion which should be drawn from the admitted facts. Under such circumstances, it is the duty of this Court to examine the entire record in order to determine whether the conclusion of the Tax Court is clearly erroneous.

The facts disclose that Robert E. Austin (hereinafter referred to as the petitioner) is a lawyer by profession, who has engaged in the private practice of the law continuously since 1912, and at all times relevant to this case has maintained his law offices in downtown Los Angeles, California, and where he spent his time in the practice of the law. Petitioner Marian H. Austin is the wife of the petitioner. Her occupation was that of a housewife, who had but little connection with the acquisition and sale of real property. Since 1929 petitioners have resided in Manhattan Beach, California, which is located nineteen miles south of Los Angeles. Petitioner maintained no office at Manhattan Beach, either in his home or elsewhere in that city, and the telephone number of petitioners' residence was always listed under the name of Marian H. Austin. Petitioner's name was never listed in the Manhattan Beach telephone directory. Neither petitioner was ever the holder of a license as a real estate agent or broker, nor the holder of any occupational license to engage in the real estate business. Since 1932, the petitioner has been active in the civic affairs of Manhattan Beach. He has been a member of the school board. He helped to organize the local water district, and has been a member of its board of directors. He represents his water district on the board of the Metropolitan Water District of Southern California.

In connection with the activities of petitioner in the acquisition of real property, the record discloses that petitioner first became the owner of property in Manhattan Beach in 1918, which was transferred to him in payment for legal services. From 1918, petitioners owned either a cabin or a home in Manhattan Beach, where they established their residence in 1929, at which time the population of Manhattan Beach was approximately 5,000.

Following World War II, people became interested in Manhattan Beach, and a large amount of real estate development there occurred after 1945. The next activity of petitioner in the acquisition of real property was in 1943, when petitioner and others caused the county tax collector to put on sale a substantial number of beach lots, then owned by the State of California, acquired for nonpayment of taxes. The tax collector would not then list the lots for sale unless the person requesting they be offered agreed to make opening bids. Under this arrangement, petitioner caused 30 or 40 lots to be on the list for sale. All of the lots were taken by other bidders except two. Petitioner acquired title to one lot, which he sold in 1953. At the same sale, petitioner bid in a lot for a friend, which five years later was sold by the tax collector again for non-payment of taxes.

In 1944 petitioner in two transactions acquired five lots. Three of them were received in payment for legal services, and were located in Riverside and San Bernardino Counties. Taxes were never paid by petitioner on these lots, and they were subsequently sold for non-payment of taxes. Two other lots acquired in that year were located across the street from where petitioners were then residing, and were purchased to protect the character of the neighborhood.

In 1945 and 1946, petitioners acquired 134 lots. 102 of the lots acquired during these two years were sold to petitioners by the City of Manhattan Beach. Certain property located in Manhattan Beach was owned by the State of California and was not on the city tax rolls. In order to list the property on the city's tax rolls it had to be privately owned, and the officials of the city were desirous of bringing about this result. Accordingly a plan was devised in 1944, whereby the city could acquire the property and then sell it to private parties. This plan entailed expenditures in amounts greater than the officials of the city were prepared to undertake. To aid in carrying out their plan, petitioner and three others agreed to pay the city any loss it might suffer as a result of this plan. The city tried and held unsuccessful auction sales, and called on the guarantors to make good their guarantee. In accordance with this agreement, petitioner purchased 102 lots. This arrangement was finalized in 1945, and deeds were delivered in 1945 and 1946. Nine of the 134 lots above mentioned were acquired in 1945. These purchases were connected with petitioner's membership in the Manhattan Beach Property Owners Association, and that association's interest in acquiring a park. Two of the lots acquired by petitioners in 1946 were located across the street from where they then resided and were purchased to protect the character of the neighborhood. Twenty-one of the lots were acquired in 1946. These acquisitions came about in the following manner: A client of petitioner was involved in a joint venture concerning real property. At the death of the client, petitioner was retained by the deceased's family to represent them in the disposition of the joint venture property. In the course of winding up the joint venture, while acting on behalf of the family, said petitioner entered the highest bid for the property. Petitioner paid the amount bid to the joint venture, and the property was sold to him.

In 1947 petitioner acquired 16 lots. The acquisitions of real estate in 1947 are as follows: Four lots which adjoined property already owned by them were acquired to provide automobile parking facilities if needed. In the same year, petitioners acquired two tracts of land which totaled 125 acres. This property was located on the mountain side in the northern part of Los Angeles. Part of the consideration paid by petitioner for these tracts was cancellation of the indebtedness owing by the sellers to petitioner for legal services. In the same year, petitioner purchased six lots for possible use as a site for a home. They built on these lots toward the end of 1948, and since that time it has been their home. Two other lots acquired by petitioner in 1947 were transferred to them by a couple who had earlier been given the property by petitioner with the understanding that it be paid for when the purchasers were able. The uncertain financial position of the couple in 1947 resulted in the re-transfer of the property to petitioners. Two lots purchased by petitioners in 1947 from a real estate broker were subsequently improved and furnish petitioners with rental income. Two lots were acquired by petitioners in 1947 under the following circumstances: On one occasion in 1947 a client came to petitioner's office and discussed with him problems concerning certain lots owned by the client's daughter. The client thought his daughter would eventually lose money on these lots. He returned about a week later, told petitioner that he had been advised that he did not have long to live, and asked the petitioner to

purchase the daughter's property, which petitioner did.

The following acquisitions of real property were made in 1948: Four lots were purchased for residential purposes, and petitioners lived in the house thereon during 1948. They sold this property after moving into the house built on the six lots mentioned above. Three lots were acquired from the Pacific Land and Title Company, because they were cheap.

In 1949, petitioners purchased one lot, to make available additional parking and sewage facilities to a building owned by petitioner, which housed a laundry. In 1950, petitioners purchased one lot from a neighbor who was unable to pay a debt to petitioner. Petitioner paid for the lot in part by cancelling the indebtedness. Petitioners acquired no real property during the years 1951 and 1952.

■ We have reviewed in detail the acquisitions of real property made by petitioners for the period 1943 through 1952. While we realize that the ultimate question is the purpose for which the property is held, the purpose for which property is acquired may throw light on the ultimate question, and is entitled to some weight. Rollingwood Corp. v. Commissioner, supra. From the whole record, the only reasonable conclusion is that the properties were acquired as investments. The pattern of acquisition and the period over which it extended is wholly inconsistent with any claim that petitioners were in the business of acquiring real estate for the purpose of sale.

■ We come now to the question as to whether or not these properties were held by petitioners primarily for sale to customers in the ordinary course of petitioner's trade or business. Admittedly, petitioner was engaged in the practice of law throughout the period involved. He was also active in the civic affairs of his home city. Was petitioner also engaged in the business of selling real estate, and was the property held primarily for sale to customers? The words and phrases "trade or business",

"ordinary" and "customers" are to be construed in their ordinary meanings. "To be engaged in the real estate business means to be engaged in that business 'in the sense that the term usually implies.'" Yunker v. Commissioner of Internal Revenue, 6 Cir., 256 F.2d 130, 133. The word "business" " * * * implies that one is kept more or less busy, that the activity is an occupation. It need not be one's sole occupation, nor take all his time. It may be only seasonal, and not active the year around. It ordinarily is implied that one's own attention and effort are involved * * * *" Snell v. Commissioner of Internal Revenue, 5 Cir., 97 F.2d 891, 892. As stated in Fahs v. Crawford, 5 Cir., 161 F.2d 315, at page 317, "Of course, a person may be engaged in more than one business, and may carry on his business through others. Carrying on a business, however, implies an occupational undertaking to which one habitually devotes time, attention, or effort with substantial regularity. Merely disposing of investment assets at intermittent intervals, without more, is not engaging in business, even though some preliminary effort is necessary to render the asset saleable."

■ The record in this case discloses that neither petitioner was a licensed real estate agent or broker. They did no advertising whatsoever to promote the sales of their property. They did not post any "for sale" signs on their property. They did not list their property with real estate brokers. The record does not show a single activity on the part of the petitioners that they were holding their property for sale. All that the record shows is that the property was being held by petitioners. Sales were initiated by prospective customers who contacted petitioners through the mail or over the telephone. Negotiations were conducted in the same manner, and petitioner often did not come into personal contact with the purchasers. On some occasions, sales were initiated by brokers who were acting for third parties. People interested in purchasing property in Manhattan Beach would go through the tax rolls to

learn the names of property owners. Owners of property received numerous unsolicited inquiries concerning their property. Most of the sales were closed at escrow offices and not at petitioner's office, although on occasions petitioner did prepare the legal documents in connection with the sale in his law offices. Such activity would be that of a lawyer, and not the activity of one engaged in the business of selling real estate.

During the tax years in question, 1950, 1951 and 1952, the petitioner purchased one lot in 1950, and none in 1951 and 1952. The one purchased in the three-year period was from a neighbor who was unable to pay a debt to petitioner, who paid for the lot in part by cancelling the indebtedness. During the same period petitioner sold eleven lots in 1950. One had been held seven years, four for five years, and six for four years. Twenty-three lots were sold in 1951; one had been held for six years, twenty for five years, and two for four years. Fourteen were sold in 1952; two had been held for eight years, four for seven years, six for six years, two for five years, and one for three years. The lots sold during this three-year period had been held for from three to eight years.

It is stated in Palos Verdes Corp. v. United States, 9 Cir., 201 F.2d 256, at page 258: "It is sound law that holding an asset for many years indicates an intention to hold for investment, rather than for sale, Merchants Nat'l Bank of Mobile v. Commissioner, 1950, 14 T.C. 1375, 1379, and the long period of holding assets without being disposed of violates the concept of an organized business with respect thereto. Mackall v. Commissioner, 1944, 3 T.C.M. 701; see also Loewnberg v. Commissioner, 1948, 7 T.C.M. 702. And as was said in Harriss v. Commissioner, 2 Cir., 1944, 143 F.2d 279, 280–281, 'A hope, when a purchase is made, that the property acquired [or a holding thereafter, we assume] may at some later time be sold at a profit, will not transmute a long time investment in land * * * into a business of buying and selling real estate, or change a capital transaction into an ordinary busines profit or loss.' "

Petitioner did nothing to attract prospective buyers. Prospective buyers after checking with tax rolls would seek out the petitioner. The only time or effort devoted by petitioner was after he had been sought out by prospective purchasers or their brokers, and such time and effort related only to negotiations carried on, mostly over the telephone, as to sales prices and terms. The transactions were consummated by title companies. There is nothing in the record to suggest that such negotiations were extensive or required much effort or time.

The profits realized by petitioners, as well as the sales, were not the result of any efforts expended by petitioner. After 1945 there was a large amount of real estate development in Manhattan Beach. Persons were seeking to buy lots there, and as a result of such demand petitioners were able to sell lots at substantial prices which he had purchased for relatively small sums or acquired in payment of legal fees. This increase in prices bore no relationship to petitioner's investment or the time he devoted to consummate sales.

The fact that net profits from sales substantially exceeded petitioner's net income from his law practice does not establish that petitioner devoted little time to his law practice and much time to real estate activity. In fact, the record is to the contrary.

It is our view, based upon the entire record, that petitioner was not engaged in the business of selling real property during the tax years in question, and that the properties sold were not being held primarily for sale to customers. The conclusion of the Tax Court in our opinion is clearly erroneous, and on the entire record a mistake has been made. The decision of the Tax Court is reversed, and the cause remanded to the Tax Court for redetermination of petitioners' tax liability consistent with the views expressed herein.