REAL ESTATE CORPORATION, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69418. Filed January 24, 1961.

*N. E. Snyder, Esq.*, for the petitioner.
*Edward E. Pigg, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's income tax for the taxable years 1950, 1951, and 1952 as follows:

| Year | Deficiency |
|------|-----------:|
| 1950 | $3, 613. 09 |
| 1951 | 8, 296. 05 |
| 1952 | 25, 418. 61 |
| Total | 37, 327. 75 |

Certain adjustments have been stipulated by the parties, and the issues remaining for determination are (1) whether the income from certain sales of real estate is entitled to capital gains treatment, and (2) whether petitioner is entitled to postpone recognition of a gain from the sale of certain realty.

#### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Petitioner is a corporation organized on January 19, 1949, under the laws of Kansas, with its principal office at 700 Central Avenue, Kansas City, Kansas. Petitioner filed its corporation income tax returns for the calendar years 1950 and 1951 with the then collector of internal revenue, district of Kansas. It filed its 1952 return and an amended return for 1952 with the director of internal revenue, Wichita, Kansas. Appropriate consents have been executed for the years involved herein.

Riverview State Bank, hereinafter called Riverview, is a State banking corporation of Kansas, also located at 700 Central Avenue, Kansas City, Kansas. As a bank, it is forbidden under Kansas law to hold or own real estate, with exceptions not here relevant.

The City of Kansas City, Kansas, paid for certain of its public improvements by the issuance of tax bills, which contractors would

sell to purchasers to get funds to pay their employees. Each bill became a lien on tracts of land in the area, which were subject to assessment. Riverview purchased several hundred thousand dollars' worth of these tax bills, an action approved by the Kansas banking authorities. However, when the landowners failed to pay their taxes, it became necessary for Riverview to purchase title to the land at tax sales to protect its investment. State and Federal bank examiners objected to these purchases of land, and a wholly owned subsidiary corporation named General Securities Corporation was formed to hold the land. The examiners again objected, whereupon a group of persons, with but one exception stockholders of Riverview, formed petitioner to hold the land thus acquired at tax sales. Petitioner purchased the assets of General Securities, giving its note in the amount of $23,944.02. The number of lots thus acquired was between 1,000 and 2,000.

Thereafter, during the years 1949–1954, petitioner engaged in the following transactions:

| Year | Purchases | | Sales | | Sales proceeds | Other receipts | Sales proceeds as percentage of gross receipts | Net income from realty sales as percentage of total net income |
|------|-----|-----------------|-----|-----------------|----------------|----------------|-----------------------------------------|------------------------------------------------------|
|      | Lots | Trans-actions | Lots | Trans-actions | | | | |
| 1949 | 44 | (1) | 62 | 18 | $21,672.50 | (1) | (1) | (1) |
| 1950 | 80 | 9 | ²32 | 18 | 22,050.00 | $32,252.91 | 40.6 | 82.5 |
| 1951 | 24 | 6 | ²63 | ³14 | 18,254.88 | 41,570.48 | 30.5 | 61.6 |
| 1952 | 9 | 3 | ²117 | 20 | 57,190.98 | 56,038.09 | 50.5 | 84.4 |
| 1953 | 9 | 4 | 52 | ³18 | 17,333.33 | 59,944.92 | 22.0 | 31.8 |
| 1954 | 21 | 13 | ²28 | ³6 | 20,311.85 | 53,793.39 | 27.0 | 33.3 |

¹ Not shown.
² Plus tracts of various sizes.
³ Excludes condemnations by the city.

The parcels involved were scattered generally throughout the city.

Petitioner maintained no separate office, but used the address of Riverview. It paid no salaries, no rent, no dividends, and maintained no listings in any telephone directory or in the Polk city directory. Petitioner is not a licensed real estate broker or agent. No soliciting of customers by newspaper advertising, posting handbills, or "For Sale" signs was done by petitioner. Purchasers usually came to petitioner after searching the tax records at the courthouse.

During the taxable years at issue, the purchasers contacting petitioner were frequently customers of Riverview or adjacent landowners. Petitioner sometimes attempted to lease these properties, but for various reasons was unable to do so and sold them instead.

Petitioner was formed to protect Riverview's investments and to accumulate income from investments. Its ordinary income was expected to be lease rentals, the primary purpose at acquisition of a property being to hold the real estate for its investment opportunities

and advantages. Some of the proceeds from sales have been reinvested in other property purchased at tax sales. Between 10 and 20 of the unimproved properties acquired at tax sales have been leased for billboards and gardens. No parcels acquired at a tax sale have been improved by petitioner. Petitioner's improved and leased parcels were separated on its books from the unimproved property purchased at tax sales. The improved properties were acquired privately, and were leased. Petitioner has lost some parcels by failure to pay taxes, pursuant to a policy of not paying taxes on property it felt it could not lease or in which it felt it had made a bad investment. Petitioner's income was expected to be, and in fact was, insufficient to pay the taxes on all of its land if it all had been retained.

In 1952 the Union Pacific Railroad planned to expand its yards in Kansas City, Kansas. This would constitute a public improvement entitling Union Pacific to have the necessary property condemned. The usual procedure was to try to negotiate a sale with the property owner involved before commencing condemnation proceedings, leaving the landowner the choice of selling or having his land condemned. In 1952 petitioner sold 77 lots to Union Pacific for the latter's expansion of its yards, the price therefor being $30,878.48.

Petitioner was unable to reinvest these proceeds at tax sales of unimproved lots in the same area because the city was not foreclosing on flood victims. Similar land in other areas was available for investment at tax sales. In 1952 approximately $27,000 of these proceeds was invested in stock of the First National Bank, which stock was sold in 1955 to petitioner's president.

On December 31, 1953, petitioner mailed a partially completed Treasury Form 1114, "Application To Establish A Replacement Fund," to the district director of internal revenue, Wichita, Kansas, which was received in said director's office on January 4, 1954. This form requires the applicant to "proceed as expeditiously as possible" to restore the property condemned. Respondent took no action on petitioner's application.

In its original 1952 income tax return, petitioner elected to recognize the gain from the sale to Union Pacific, but thereafter on June 15, 1953, it filed an amended return based on nonrecognition of the gain and took credit thereon for its alleged overpayment of the first installment due under its original return.

Petitioner was engaged in the business of holding real estate for investment purposes. It was also engaged in the business of holding unimproved land primarily for sale to customers in the ordinary course of business.

OPINION.

The first issue presented is whether respondent was correct in determining that the gains from the sales of the unimproved lots

were ordinary income because the lots were held primarily for sale to customers in the ordinary course of business under sections 117(a)(1)(A) and 117(j)(1) of the Internal Revenue Code of 1939.[1] Petitioner contends that it is entitled to long-term capital gains treatment under the same sections.

The courts have considered various criteria in ascertaining whether or not realty was held primarily for sale to customers in the ordinary course of business, but no single factor has been held decisive, and the relative significance of each factor varies from case to case. The issue is always one of fact, and previous decisions are at best indicative of the approach used in cases involving similar factual situations.

Petitioner relies on a number of the criteria frequently considered. Little time was devoted by petitioner to buying and selling real estate, no soliciting, advertising, or listing was done, and no activities were engaged in with a purpose of making the land more salable. Petitioner argues that this lack of "busyness" puts it within the scope of *James G. Hoover*, 32 T.C. 618 (1959), and *Austin* v. *Commissioner*, 263 F. 2d 460 (C.A. 9, 1959), reversing a Memorandum Opinion of this Court.

In *Hoover* we relied on a lack of activity with relation to scattered holdings of land, where the taxpayer spent most of his time in another business. The income from this other business far exceeded the income from the sales, which averaged only 3 or 4 per year, with 11 being the highest number in any one year. This other source of Hoover's income was the "strongest factor" in his favor (p. 627–628) :

About the strongest factor supporting petitioners is the relation of petitioners' other income to the gains derived from the sales of realty. Generally, during the years in question the income of James and the partnership from normal business activities far exceeded income from sales of realty. James' personal income during the 3 years never dropped below $95,000 and went up in 1954 in excess of $100,000. The capital gains reported by James for these 3 years were $10,240.62 in 1953, $8,234.93 in 1954, and $20,183.93 in 1955.

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business ;

* * * * * * *

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

We also stressed the great length of time the lots had been held, running up to 27½ years. Consider how widely the facts in the instant case differ. Petitioner held its lots for relatively short periods, averaged about 17 sales transactions involving about 70 lots during each of the years in issue, and the net income from such sales comprised about 75 per cent of petitioner's total net income for such years.

Even petitioner concedes that during the years at issue the income from sales of the unimproved lots constituted 30 to 50 per cent of its gross receipts, but we look upon net income, or gain, as a more valid comparison.

In its corporate affairs, petitioner has failed to show that the time spent in buying the lots, checking the titles, and selling the lots did not constitute a major part of its corporate life. Although the officers of petitioner did not devote much of their time to it, what is important is the amount of the total activity *of petitioner* that was devoted to buying and selling the lots. Petitioner's officers testified that sales were made to bank customers, public bodies in which the officers were active or influential, and to alleviate the housing crisis caused by the 1951 flood. Petitioner's president was very active in the flood relief activities, and his well-known association with them rendered advertising of petitioner's available properties less essential. Although as a rule petitioner's properties were scattered, the lack of solicitation of customers is less significant here than in *Hoover*, and is not controlling.

*Austin* v. *Commissioner, supra*, is equally inapposite. In that case the taxpayer purchased only one lot during the 3 years involved. In addition, the circumstances of acquisition negatived any purpose of acquiring property for sale. In the instant case, petitioner regularly continued to purchase numerous lots during the years at issue. In addition, petitioner realized at the time of its purchases that it would be unable to meet its tax obligations on a portion of its acquisitions, and was willing to and did forfeit lots for nonpayment of taxes from time to time. It is fair to conclude that petitioner would have been ready to sell these lots had there been a market, and that petitioner was always aware of the necessity of disposing of some of the recent acquisitions. The necessity of sale was a consideration, although not determinative, in *Charles E. Mieg*, 32 T.C. 1314 (1959).

Respondent cites numerous cases in his brief, all of which are so clearly distinguishable on their facts as to make individual treatment unnecessary. Respondent's position is that the continuity and frequency of purchases and sales, the substantial portion of petitioner's income due to such sales, and the willingness to sell lots shortly after their purchase negative any investment objectives. Respondent concedes, and we have so found, that petitioner was in the business of

leasing improved real estate. Respondent further argues that petitioner was in a second trade or business, that of buying unimproved lots at tax sales and selling them.

Petitioner devoted much of its corporate actions to buying and selling lots and incurred fees which it deducted as expenses. It received an average of 40 per cent of its gross receipts and 75 per cent of its net profits from sales; and its sales dealings were more extensive, frequent, and continuous than its rental dealings.

A person may be both an investor and a dealer with regard to his real estate holdings. As we said in *Charles E. Mieg, supra* at 1321:

It is plain that a taxpayer may be both a dealer and an investor in real estate. Cf. *W. Linton Atkinson*, 31 T.C. 1241, 1247; *D. L. Phillips*, 24 T.C. 435, 445; *Walter R. Crabtree*, 20 T.C. 841, 846; *Nelson A. Farry*, 13 T.C. 8, 14; Rev. Rul. 57–565, 57–2 C.B. 546. And it is our judgment on the record before us that the petitioners had such a dual status. * * *

See also *Eline Realty Co.*, 35 T.C. 1 (1960). Acquiring and holding property with the expectation of selling as soon as a reasonable profit can be realized is not holding for investment. *Curtis Co.*, 23 T.C. 740 (1955), affirmed in part, reversed in part on other grounds, 232 F. 2d 167 (C.A. 3, 1956). The frequency and continuity of sales is a valuable indicator of whether or not a rapid resale was contemplated.

Petitioner contends that, in any event, it did not hold the unimproved lots primarily for sale but held them primarily for lease, and attempts to explain the various sales by stating that it could not refuse a customer of Riverview, that it was performing a civic duty, or that the offer was frankly too good to pass up.

The word "primarily" means "essentially" or "substantially," and where one holds property intending to rent if the rental market looks good or to sell if opportunities in sales appear advantageous, the property is held with an essential purpose to sell. *Rollingwood Corp.* v. *Commissioner*, 190 F. 2d 263, 266 (C.A. 9, 1951), affirming a Memorandum Opinion of this Court.

As we said in *Raymond Bauschard*, 31 T.C. 910, 916:

Equally material to a proper consideration of the question is a recognition of the fundamental objective of the capital gain provisions of the Code; this is to grant preferential treatment to the gains realized upon those transactions which are not normally the source of business income, thus easing the tax burden which might otherwise result upon the sale of a capital investment. Inasmuch as these provisions constitute an exception to the normal tax requirements of the Code, they are to be narrowly construed. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 964 (1958); *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955), rehearing denied 350 U.S. 943 (1956).

Considering the entire record, and that, during the years at issue, sales of unimproved tax-sale lots were so frequent and constituted

and resulted in such large percentages of petitioner's total activity and income, we conclude that petitioner held the unimproved lots sold during the years at issue primarily for sale to customers in the ordinary course of its business.

The second issue presented is whether or not petitioner is entitled to postpone recognition of the gain from the sales in 1952 to the Union Pacific Railroad. Petitioner claims nonrecognition under section 112(f) of the Internal Revenue Code of 1939,[2] contending that its action in mailing Treasury Form 1114 to the district director on December 31, 1953, amounted to a fulfillment of the requirements of the regulations then in effect under subsection (ii) of section 112(f)(3)(B), *supra*. Such regulation is Regulations 118, section 39.112(f)-1(c)(3), which provides in pertinent part:

Such application shall be made prior to the expiration of the one year after the close of the first taxable year in which any part of the gain upon the conversion is realized. * * * No extension of time shall be granted pursuant to such an application unless the taxpayer executes a bond, with such surety as the Commissioner may require, * * *. Only surety companies holding certificates of authority from the Secretary of the Treasury as acceptable sureties on Federal bonds will be approved as sureties. * * *

The surety bond portion of said Form 1114 mailed by petitioner on December 31, 1953, was partially completed in that petitioner's name was written in as principal and Willard J. Breidenthal's name was written in as surety, but the bond was otherwise left blank and Breidenthal did not sign it as proposed surety. Obviously, this

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(f) INVOLUNTARY CONVERSION.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

* * * * * * *

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) Nonrecognition of Gain.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe. * * *

(B) Period Within Which Property Must Be Replaced.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of * * * condemnation * * *, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary, at the close of such later date as the Secretary may designate upon application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary may by regulations prescribe.

could not be and was not a compliance with the Secretary's regulation requiring a surety company holding a certificate of authority, etc., and petitioner's argument based upon respondent's failure to take any action with respect to such Form 1114 is unavailing.

In addition, it is obvious that petitioner did not "proceed as expeditiously as possible" to replace or restore the condemned property. In fact, shortly after the sale in 1952, petitioner invested the proceeds in bank stock, which was sold in 1955 to petitioner's president. There is no showing of any effort to replace the property after 1952, nor is there any showing of the current status of the fund. Although tax sales in the flooded area were rare in 1952, there is no showing that after the funds were invested in bank stock, opportunities to replace were still unavailable. In addition, there is no evidence that property in the same vicinity as the condemned parcels was not available for purchase by means other than tax sales.

We therefore conclude that petitioner is not entitled to nonrecognition of the gain from the sale of the 77 lots to Union Pacific in 1952.

In order to effectuate certain unrelated adjustments stipulated to by the parties,

*Decision will be entered under Rule 50.*