T.C. Memo. 2014-3

UNITED STATES TAX COURT

CORDELL D. POOL, ET AL.,[1] Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.   16837-11, 16911-11,          Filed January 8, 2014.
              16965-11.

<u>Peter T. Stanley</u>, for petitioners.

<u>Randall Craig Schneider</u>, for respondent.

MEMORANDUM OPINION

GOEKE, <u>Judge</u>:  Respondent determined deficiencies in and additions to tax

with respect to petitioners' Federal income tax as follows:

_____

[1]The cases of the following petitioners are consolidated herewith:  Thomas
J. Kallenbach, docket No. 16911-11, and Justin and Kimberly Buchanan, docket
No. 16965-11.

**[\*2]** <u>Docket No. 16837-11--Cordell D. Pool</u>

| Year | Deficiency | Addition to tax<br>sec. 6651(a)(1) |
|---|---|---|
| 2005 | [1]$20,141 | $7,714 |

<u>Docket No. 16911-11--Thomas J. Kallenbach</u>

| Year | Deficiency | Addition to tax<br>sec. 6651(a)(1) |
|---|---|---|
| 2005 | $59,536 | $11,674 |

<u>Docket No. 16965-11--Justin and Kimberly Buchanan</u>

| Year | Deficiency | Addition to tax<br>sec. 6651(a)(1) |
|---|---|---|
| 2005 | $48,217 | $12,054 |

[1]Amounts are rounded to the nearest dollar.

Because these cases present common issues of fact and law, they were consolidated for purposes of trial, briefing, and opinion. <u>See</u> Rule 141(a).[2] The issues for decision are:

---

[2]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the year at issue.

**[*3]**  (1)  whether petitioners incorrectly characterized ordinary partnership income as long-term capital gain for tax year 2005.  We hold that they did; and

(2)  whether petitioners are liable for section 6651(a)(1) additions to tax for failing to timely file their returns.  We hold that they are.

## Background

The parties fully stipulated the facts in these cases pursuant to Rule 122. The stipulation of facts is incorporated by this reference, and the facts are found accordingly.

Petitioners resided in Montana when they separately filed their timely petitions.  The parties have stipulated that these cases are appealable to the U.S. Court of Appeals for the Ninth Circuit.

## I.      Individual Income Tax Returns

Petitioner Cordell Pool filed his 2005 Form 1040, U.S. Individual Income Tax Return, on October 22, 2006.  He had not requested an extension of time to file the return.

Petitioners Justin and Kimberly Buchanan had requested and received an extension of time to file their 2005 Form 1040.  The extended due date was October 15, 2006, but they did not file until June 14, 2007.

**[\*4]** Petitioner Thomas Kallenbach filed his 2005 Form 1040 on October 19, 2006. He had not requested an extension of time to file the return.

Petitioners each granted respondent an extension until October 15, 2011, to review their 2005 tax returns. On April 15, 2011, respondent separately issued notices of deficiency for each petitioner's 2005 return.

II.    Concinnity, Elk Grove PUD, and Elk Grove Development Co.

Concinnity, LLC (Concinnity), was organized in the State of Montana in March 2000 by Cordell Pool, Justin Buchanan, and Thomas Kallenbach (petitioners).[3] The initial members and owners of Concinnity were petitioners and Jay Josephs.[4] On its initial Form 1065, U.S. Return of Partnership Income, Concinnity elected to be taxed as a partnership.[5]

---

[3]From this point forward, the term "petitioners" will refer to Cordell Pool, Justin Buchanan, and Thomas Kallenbach unless specifically indicated to include Kimberly Buchanan.

[4]Jay Josephs is not a party to these cases because he was later disassociated from Concinnity and his interests in Concinnity and Elk Grove Development Co. appear to have been divided equally between Justin Buchanan and Thomas Kallenbach.

[5]Concinnity is not subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, because it falls under the TEFRA exception for small partnerships. See sec. 6231(a)(1)(B)(i).

[*5] Petitioners incorporated Elk Grove Development Co. in the State of Montana in August 2000.  The initial shares of stock were owned by petitioners and Jay Josephs.

Concinnity purchased 300 undeveloped acres outside of Bozeman, Montana, for $1.4 million from Lucille Donlan.  Ms. Donlan deeded the property to Concinnity on June 27, 2000, with a closing date of July 5, 2000.  At the time of purchase, the land was already divided into four sections--referred to as phases 1-4.  This property later became the Elk Grove Planned Unit Development (Elk Grove PUD), and its disposition is the subject of this dispute.

On the same day Concinnity purchased the land, Concinnity obtained two mortgage loans from Mountain West Bank in the amounts of $2.35 million and $400,000, respectively.  Concinnity obtained another mortgage loan on June 18, 2001, of approximately $725,332 from a group of individuals listed as mortgagees.  The Elk Grove PUD property secured the mortgages.

Concinnity entered into an agreement with Elk Grove Development Co. that gave Elk Grove Development Co. the exclusive right to purchase phases 1-3 (consisting of 300 lots) of Elk Grove PUD (land exclusive option agreement).  This agreement required Elk Grove Development Co. to complete all infrastructure improvements necessary to obtain the final plat of each phase of Elk

[*6] Grove PUD. Concinnity also entered into an agreement with Gallatin County, Montana, wherein Concinnity agreed that it, as subdivider, "shall, at its sole cost and expense, pay for the improvements" to the land in phase 1 (improvements agreement).

In June 2001 Concinnity filed an affidavit, in response to a Gallatin County Subdivision Regulation that required Concinnity to bond 150% of the total improvement costs, that stated in part: (1) "Concinnity is the developer of proposed subdivision Elk Grove * * * [PUD] in Gallatin County, Montana" and (2) "As of June 13, 2001, Concinnity has entered into buy-sell agreements for the sale of 81 lots within * * * [phase 1] of Elk Grove PUD for an average fair market value of $41,000.00 per lot."

A few exhibits were appended to the land exclusive option agreement. Exhibit B outlined the construction components necessary to secure the final plat of each phase. The construction costs that exhibit B outlined totaled more than $5.2 million. Exhibit C listed the sale price on which Concinnity and Elk Grove Development Co. agreed for the lots subject to the option. The 300 lots in phases 1-3 had a total sale price of more than $7.6 million. Exhibits B and C were prepared on the same day--June 20, 2000.

**[*7]** Concinnity consistently reported on its Federal income tax returns from 2003 to 2005 that it sold land in phase 1 on May 31, 2001, and phases 2 and 3 on February 21, 2003. Concinnity reported $500,761 of long-term capital gain on its 2005 Schedule D, Capital Gains and Losses. This gain resulted from the taxable portions of two installments it received on the phase 2 and 3 land sales. Concinnity reported the installments on its Forms 6252, Installment Sale Income. Each of Concinnity's Forms 6252 from 2003 to 2007 shows a gross profit percentage of 90.07% for the sale of phase 2 and 93.86% for the sale of phase 3.

Discussion

I.    Burden of Proof

Generally, the Commissioner's determinations are presumed correct and the taxpayer bears the burden of proving otherwise. Rule 142(a); see Welch v. Helvering, 290 U.S. 111, 115 (1933). Although this is a fully stipulated case, petitioners still bear the burden of proof and must establish the facts necessary to their case. See Rule 122(b); Lawinger v. Commissioner, 103 T.C. 428, 438 (1994). Petitioners have not argued that respondent bears the burden of proof with respect to the issues discussed below.

**[*8] II.    Character of Income**

These cases present the purely factual question of whether gain from the sale of real property resulted in ordinary income or capital gain.  Respondent contends that Concinnity's 2003 land sale produced ordinary income.   Petitioners argue the sale produced capital gain because they held the land for investment.

Section 1201(a) provides for preferential treatment with respect to gain realized on the sale of a capital asset.  Section 1221(a)(1) defines a capital asset as "property held by the taxpayer * * * but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

The term "primarily" for purposes of section 1221 means "of first importance" or "principally".  See Malat v. Riddell, 383 U.S. 569, 572 (1966).  Whether a taxpayer held specified property primarily for sale to customers in the ordinary course of business is a question of fact.  Austin v. Commissioner, 263 F.2d 460, 461 (9th Cir. 1959), rev'g T.C. Memo. 1958-71.  This Court and the Court of Appeals for the Ninth Circuit have identified several relevant factors for evaluating whether a taxpayer held certain properties primarily for sale to customers in the ordinary course of business.  Such factors include:  (1) the nature of the acquisition of the property; (2) the frequency and continuity of sales over an

**[*9]** extended period; (3) the nature and the extent of the taxpayer's business, (4) the activity of the seller about the property; and (5) the extent and substantiality of the transactions. Id. at 462; see Pritchett v. Commissioner, 63 T.C. 149, 162-163 (1974). We must decide each case upon its particular facts, and the presence of any one or more of these factors may or may not be determinative of a particular case. Austin v. Commissioner, 263 F.2d at 462.

Upon review of the relevant factors, we conclude that petitioners have not sufficiently established the facts necessary to their case,[6] nor have they carried their burden of proving respondent's determinations were in error.

A.    Nature of Property Acquisition

Respondent contends that Concinnity acquired Elk Grove PUD to divide and sell lots to customers for profit. Respondent cites two documents to support his position: (1) Concinnity's 2000 Form 1065 and (2) an affidavit Concinnity filed in June 2001.

---

[6]At calendar call, this Court warned petitioners that their failure to introduce evidence in their control could result in a presumption that such evidence, if produced, would be unfavorable. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947). Nevertheless, petitioners maintained that "the [stipulated] documents speak stronger than any of the witnesses."

[*10]   Concinnity's 2000 Form 1065 identifies its principal business activity as "development" and its principal product or service as "real estate".  Because Concinnity purchased Elk Grove PUD in 2000, respondent argues the return is evidence that Concinnity purchased the land with the intent to develop and sell it. Similarly, respondent cites two statements in an affidavit Concinnity filed in June 2001:  (1) "Concinnity is the developer of proposed subdivision Elk Grove * * * [PUD] in Gallatin County, Montana" and (2) "As of June 13, 2001, Concinnity has entered into buy-sell agreements for the sale of 81 lots within * * * [phase 1] of Elk Grove PUD".

Concinnity's 2000 Form 1065 and June 2001 affidavit together suggest that Concinnity purchased Elk Grove PUD to develop the land and sell it to customers. However, "'[w]hile the purpose for which the property was acquired is of some weight the ultimate question is the purpose for which the property is held.'" Pool v. Commissioner, 251 F.2d 233, 236 n.6 (9th Cir. 1957) (quoting Rollingwood Corp. v. Commissioner, 190 F.2d 263, 266 (9th Cir. 1951)), aff'g T.C. Memo. 1956-64; see Phelan v. Commissioner, T.C. Memo. 2004-206.

We recognize that petitioners could have decided to hold the land for investment after initially intending to develop and sell it to customers.  See Tibbals v. United States, 362 F.2d 266, 273 (Ct. Cl. 1966) ("A taxpayer's purpose

[*11] can change during the course of his holding of property, and in such cases it is the dominant purpose of his holding during the period prior to the sale which is critical."). However, petitioners have not produced any evidence that indicates that their intentions changed.[7]

The record does not clearly establish Concinnity's purpose in acquiring the land, but the evidence suggests it acquired the land for development and sale. Petitioners have failed to carry their burden of producing evidence that they held the property for investment purposes. This factor weighs in favor of respondent.

B.    Frequency and Continuity of Sales

Frequent and substantial sales of real property more likely indicate sales in the ordinary course of business, whereas infrequent sales for significant profits are more indicative of real property held as an investment. Phelan v. Commissioner, T.C. Memo. 2004-206; Paullus v. Commissioner, T.C. Memo. 1996-419. Respondent argues that Concinnity was in the trade or business of land development and sales and that it had at least one customer, Elk Grove Development Co., and potentially others.

---

[7]We note that Concinnity's 2001-07 Forms 1065 state that "real estate" is its principal business activity and "investment" is its principal product or service. However, given the inconsistencies represented in the tax returns, see infra note 8, we do not give this much weight.

**[\*12]** The record does not indicate that Concinnity continuously and regularly purchased raw land and sold it for development. Elk Grove PUD is the only real estate Concinnity purchased. However, we cannot determine from the record how many sales Concinnity made. Concinnity's tax returns reflect two land sales between 2000 and 2003: (1) a sale of property in phase 1 on May 31, 2001, and (2) a sale of property in phases 2 and 3 on February 21, 2003.[8] However, the affidavit Concinnity filed in June 2001 states: "As of June 13, 2001, Concinnity has entered into buy-sell agreements for the sale of 81 lots within * * * [phase 1] of Elk Grove PUD for an average fair market value of $41,000.00 per lot."

The record does not establish whether the buy-sell agreements in the affidavit were to 81 different buyers or to Elk Grove Development Co. alone. The land exclusive option agreement states that Concinnity would sell the first 40 lots of phase 1 to Elk Grove Development Co. for $5,000 per lot, then $18,333 for the next 60 lots, and $32,000 for the remaining phase 1 lots. Even assuming that all of

---

[8]Concinnity's Forms 6252 state that these were the dates of sale. However, these same forms also indicate that the land was purchased on July 15, 1999, which is in conflict with the rest of the record showing Ms. Donlan deeded the property to Concinnity on June 27, 2000, with a closing date of July 5, 2000. These forms also state that the land sales were not made to a related party, yet petitioners claim Concinnity sold the property to their other wholly owned entity, Elk Grove Development Co. This just adds to the confusion in the record and further chips away at the credibility of the evidence on which petitioners rely.

[*13] the lots to which the affidavit referred were in the highest price bracket (i.e., $32,000), the average sale price could not have been $41,000 unless Concinnity sold those lots on different terms. This suggests that Concinnity made sales to customers other than Elk Grove Development Co.

Petitioners have the burden of showing that their sales were not frequent and substantial.[9] The record is unclear as to how many sales were made, when they were made, and to whom they were made. Consequently, petitioners have not carried their burden. This factor weighs in favor of respondent.

C.    Nature and Extent of Business

Respondent argues that the only documents in the record regarding Concinnity's business indicate that Concinnity brokered the deals, found additional investors for the development project, secured the water and wastewater systems, and guaranteed performance on the improvements agreement. Respondent argues that on these facts we should find that Concinnity participated in developing Elk Grove PUD and selling its lots to its customers.

---

[9] See, e.g., Phelan v. Commissioner, T.C. Memo. 2004-206 (two sales in four years were of insufficient frequency); Paullus v. Commissioner, T.C. Memo. 1996-419 (eight sales in 12 years were of insufficient frequency); cf. Pool v. Commissioner, 251 F.2d 233, 243 (9th Cir. 1957) (Two tracts of land had 70 duplexes and 100 duplexes, respectively. "In quick succession the first group was sold in a few weeks and the next group followed."), aff'g T.C. Memo. 1956-64.

**[*14]**  The affidavit Concinnity filed in June 2001 suggests that Concinnity secured buy-sell agreements with individual customers.  Petitioners have failed to present sufficient evidence to allow us to evaluate Concinnity's role in securing the agreements.  We cannot determine whether Concinnity solicited these agreements or received spontaneous offers.  We cannot determine the identity of the purchasers or even whether the agreements were ever executed.  Petitioners have failed to offer any evidence showing that Concinnity did not broker the deals.

Respondent argues that Concinnity was involved in finding additional investors for the development project after the land had been sold.  Respondent cites a mortgage loan granted to Concinnity on June 18, 2001, of $725,332 that covers portions of Elk Grove PUD.  This mortgage covered the same 300 acres of Elk Grove PUD referenced in the warranty deed from Ms. Donlan.  Petitioners have not explained why or how Concinnity was able to mortgage the portion of phase 1 that Concinnity purportedly sold to Elk Grove Development Co. on May 31, 2001, or the property that was subject to the 81 buy-sell agreements Concinnity secured by June 13, 2001.  Mortgaging land that was previously sold is not indicative of a bona fide sale.

Petitioners rely on Concinnity's tax returns to show that Concinnity did not incur any development costs, because there are no reported costs of goods sold.

**[\*15]** However, we believe the record clearly shows Concinnity developed the water and wastewater system as it agreed to do in the land exclusive option agreement.[10] We stated in Estate of Freeland v. Commissioner, T.C. Memo. 1966-283, aff'd, 393 F.2d 573 (9th Cir. 1968): "We recognize that mere efforts on the part of a land investor to construct, or assist in constructing, improvements which would enhance the value of his holding will not necessarily constitute a curse from which there is never an escape." However, in that case, the development company was paying for offsite improvements[11] to the acreage that it had an option to purchase. We found that although no improvements were made directly to the acreage not covered by the option, those improvements indirectly benefited the rest of the acreage the partnership held. We stated that the indirect element was

---

[10]Concinnity's 2000 and 2001 tax returns indicate some expenses relating to "Valley Water" and "Valley Water Works". Valley Water Works is the name of the water and sewer company that Concinnity obligated itself--in the land exclusive option agreement--to create to provide water and sewer service to all Elk Grove homeowners. Concinnity's 2003 tax return also includes as an "other current asset" water and wastewater plant costs of about $2.4 million.

[11]Similar to our cases, the term "offsite improvements" in Estate of Freeland v. Commissioner, T.C. Memo. 1966-283, aff'd, 393 F.2d 573 (9th Cir. 1968), comprehended: (a) the bringing of utilities such as water and sewer up to the boundaries of the property being developed, and (b) the installation of a water main on the property being developed.

[*16] another factor to be considered in determining the mosaic of the partnership's plans.

The facts of our cases are different from the facts of Estate of Freeland. Concinnity was directly engaged in making the water and wastewater improvements. This level of activity is more akin to a real estate developer's involvement in a development project than to an investor's increasing the value of his holdings.

We also note that in Paullus v. Commissioner, T.C. Memo. 1996-419 (citing Reithmeyer v. Commissioner, 26 T.C. 804, 813 (1956)), we stated: "Property sold as undeveloped land with development to be done under contract for the purchasers does not automatically * * * cause the land to be held for sale to customers in the ordinary course of a taxpayer's trade or business."

In Paullus, the taxpayer entered into a purchase agreement with the buyer that gave the buyer the option to purchase certain property. That purchase agreement obligated the taxpayer to complete certain improvements to the property before sale because the buyer wanted to be able to build houses and sell lots as soon as possible after closing. The parties executed the purchase agreement, and the taxpayer completed the agreed-to improvements. However, in Paullus we noted that improving and developing the land is a possible avenue to

[*17] promoting sales. We then quoted Reithmeyer v. Commissioner, 26 T.C. at

813: "The obvious reason for the platting and subdividing was to attract buyers."

On our facts, there was no need for Concinnity to construct the water and

wastewater systems as a means of promoting sales and attracting buyers because

petitioners owned the very company that was granted the exclusive right to

purchase the land. See Estate of Freeland v. Commissioner, T.C. Memo. 1966-283

("These interlocking participations provided the real guarantee that the option

would be exercised.").

Petitioners carry the burden of showing the nature and extent of their

business. As we explained above, petitioners argue that Concinnity was in the

business of investing in land, not developing land and selling it to customers.

However, the record indicates that Concinnity obligated itself to make certain

improvements to Elk Grove PUD and in fact paid for those improvements.

Petitioners have not carried their burden of proving that Concinnity's development

activities were insufficient to show that it held Elk Grove PUD primarily for sale

in the ordinary course of its trade or business. Consequently, this factor weighs in

favor of respondent.

[*18]  D.    Activity of Seller About the Property

Under this factor, we again focus on the 81 buy-sell agreements Concinnity claimed to have accumulated by June 13, 2001.  Petitioners have the burden of showing that Concinnity did not spend large portions of its time actively participating in the sales of Elk Grove PUD.  The record is unclear whether Concinnity sought out 81 individual purchasers, purchasers sought out Concinnity, or Concinnity sold only to Elk Grove Development Co.  Therefore, petitioners have not carried their burden.  This factor weighs in favor of respondent.

E.    Extent and Substantiality of the Transaction

In reviewing this transaction, respondent argues that we should ignore Elk Grove Development Co. as an entity, because petitioners incorporated it principally to evade or defeat Federal income tax.  Respondent relies on petitioners' interlocking participation in Concinnity and Elk Grove Development Co. to support this contention.  We do not agree that the identical ownership between the two companies dooms this transaction.

In Phelan v. Commissioner, T.C. Memo. 2004-206, we analyzed a factual situation similar to the one we now consider.  In Phelan, the taxpayer used an LLC to hold a 1,050-acre parcel of land and then sold 46.5 acres to an identically

[*19] owned[12] development corporation after three years. The development corporation developed[13] the land until it was suitable for residential real estate and then sold the land to an independent buyer. The Commissioner argued that the sale from the LLC to the related corporation was done solely for tax avoidance and had no independent business purpose. We disagreed and found a valid business purpose for holding the developed real estate in a separate development entity. The arrangement sheltered the LLC's sole asset, the remaining land, from any action brought against the development company. The same business purpose exists here.

The land exclusive option agreement gave Elk Grove Development Co. the option to buy only phases 1-3 of Elk Grove PUD; Concinnity retained phase 4. In accordance with that agreement, Concinnity sold only those three phases to Elk Grove Development Co. Maintaining phase 4 in a separate entity sheltered it from any potential action arising from Elk Grove Development Co.'s activity.

---

[12]As in our case, the same people owned identical interests in both the LLC and the development company.

[13]We recognize that an unrelated quasi-municipal corporation was also involved in performing infrastructure improvements to land in the district where the property at issue was, such as building roads, providing water and sanitation services, and building and maintaining parks.

**[*20]** Therefore, as in <u>Phelan</u>, we disagree with the Government's contention that Elk Grove Development Co. lacked an independent business purpose.

Respondent also argues that this transaction was not a bona fide, arm's-length transaction. The record provides little evidence regarding the extent and substantiality of the land sale transactions between Concinnity and Elk Grove Development Co. Petitioners have not provided executed sales contracts for the 2001 or 2003 land sales; instead, we must rely on the land exclusive option agreement, its attached exhibits, and the tax returns of the two companies to evaluate the terms of the transactions.

The land exclusive option agreement states: "Buyer shall pay Seller the lot price as listed in Exhibit C for any lot Buyer exercises its exclusive option to purchase." Exhibit C is labeled "Sales Agreement" and lists Concinnity as the seller and Elk Grove Development Co. as the buyer. This exhibit lists the sale price per lot[14] for phases 1-3 and reflects a total sale price for all 300 lots of approximately $7.6 million. The land exclusive option agreement had an effective

---

[14]Exhibit C does not include any background information regarding how the parties determined the per-lot sale prices.

[*21] date of July 7, 2000.[15] Just two days earlier Concinnity had purchased all four phases of Elk Grove PUD from Ms. Donlan for $1.4 million.

The parties set the option price at $7.6 million for three phases of Elk Grove PUD even though Concinnity had paid only $1.4 million for all four phases two days earlier. Although this was only an option agreement, it effectively set the sale price because Elk Grove Development Co. was sure to exercise the option given the entities' identical ownership. See Estate of Freeland v. Commissioner, T.C. Memo. 1966-283 ("These interlocking participations provided the real guarantee that the option would be exercised."). This discrepancy in price is substantial.[16] See id. (finding substantial a discrepancy between purchase price of $1,037 per acre and sale price of $2,000 per acre).[17] We recognize that some of this discrepancy may include the planned development of the water and wastewater systems. Perhaps the value of the land increased because of

---

[15]Exhibit C, which detailed the fixed sale prices for the 300 lots in phases 1-3, was prepared by the parties on June 20, 2000.

[16]Concinnity's 2003-07 tax returns reflect that Concinnity's sales of phases 2 and 3 produced a very high gross profit percentage--approximately 90% and 93%, respectively.

[17]We recognize the 300 lots in phases 1-3 are not of equal value, but dividing these two prices over the 300 lots results in a purchase price of roughly $4,666 per lot and a sale price of $25,533 per lot.

[*22] Concinnity's promise to make these improvements. However, petitioners did not offer evidence to explain the discrepancy.

Petitioners presented no evidence to support the sale prices they calculated for phases 1-3. No evidence in the record indicates Elk Grove PUD's July 2000 fair market value. However, we find it reasonable to believe $1.4 million, which Concinnity paid Ms. Donlan (an unrelated third party) to acquire the land, is representative of the fair market value of the four phases in July 2000. Consequently, we believe the fair market value of phases 1-3 was something less than $1.4 million. Petitioners have presented no evidence to justify the $7.6 million option price they granted two days later.

We find it noteworthy that on the same day the sales agreement (exhibit C) was prepared, exhibit B--outlining Elk Grove Development Co.'s expected development costs--was also prepared. Those costs totaled more than $5.2 million. We believe that these circumstances strongly suggest that petitioners chose the price to convert a large portion of the project's final profits to capital gain.[18] This is a further indication of Concinnity's involvement in the development activities of Elk Grove Development Co.

---

[18]Petitioners' lack of documentary evidence supports an inference that such evidence, if produced, would be unfavorable to petitioners' position. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165.

[*23] Petitioners bear the burden of producing sufficient evidence demonstrating that they engaged in a bona fide, arm's-length transaction. Petitioners have not carried this burden. The record reflects that the Elk Grove Development Co. agreed to buy the land at an inflated price. This factor weighs in favor of respondent.

F.    Conclusion

Petitioners bear the burden of proving that respondent's determinations are erroneous. See Rules 142(a), 122(b). After analyzing the relevant factors, we conclude that petitioners have failed to carry that burden. Accordingly, we sustain respondent's determination that Concinnity held Elk Grove PUD primarily for sale in the ordinary course of its trade or business and improperly reported ordinary income as capital gain.

III.    Section 6651(a)(1) Failure To File Addition to Tax for 2005

Respondent determined that petitioners[19] are liable for section 6651(a)(1) additions to tax for failing to timely file their returns. Section 6651(a)(1) imposes additions to tax for failing to timely file Federal income tax returns, unless it is shown the failure was due to reasonable cause and not willful neglect. The

---

[19]We now use the term "petitioners" to also include Kimberly Buchanan.

**[*24]** amount of the addition can be up to 25% of the amount required to be shown as tax on the return. Sec. 6651(a).

Section 7491(c) places the burden on the Commissioner to produce sufficient evidence to support the imposition of an addition to tax. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer to raise any issues that would negate the appropriateness of the addition to tax, such as reasonable cause. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

Respondent has met the burden of production, because the stipulation of facts and the attached exhibits establish that petitioners filed their returns more than five months after they were due. Petitioners have made no arguments regarding the additions and consequently have abandoned their challenge. See Davis v. Commissioner, 119 T.C. 1, 1 n.1 (2002). Accordingly, we sustain respondent's determinations concerning section 6651(a)(1) additions to tax.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

[*25] To reflect the foregoing,

<u>Decisions will be entered for</u>

<u>respondent</u>.