T.C. Summary Opinion 2018-10

UNITED STATES TAX COURT

BRUCE JOSEPH LEVITZ AND EVELYN BORLONGAN LEVITZ, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15393-14S.                           Filed March 8, 2018.

Bruce Joseph Levitz and Evelyn Borlongan Levitz, pro sese.

Tyson R. Smith, for respondent.

SUMMARY OPINION

PANUTHOS, <u>Special Trial Judge</u>:  This case was heard pursuant to the

provisions of section 7463 of the Internal Revenue Code in effect when the

petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not

_____

[1]Unless otherwise indicated, subsequent section references are to the

(continued...)

reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

In a notice of deficiency dated April 7, 2014, respondent determined a deficiency of $8,453 in petitioners' 2008 Federal income tax and a section 6662(a) accuracy-related penalty of $1,691. After concessions,[2] the issue for decision is whether losses incurred in petitioner Bruce Joseph Levitz's real estate activities are ordinary losses, rather than capital losses.

## Background

Some of the facts have been stipulated, and we incorporate the stipulation of facts by this reference. Petitioners resided in California when the petition was timely filed.

---

[1](...continued)
Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent made a number of adjustments to petitioners' 2008 Form 1040, U.S. Individual Income Tax Return. Petitioners did not address any of the adjustments reflected on the notice of deficiency or the sec. 6662(a) penalty in their petition. These issues are therefore deemed conceded. See Rule 34(b)(4) ("Any issue not raised in the assignments of error shall be deemed to be conceded."); see also Funk v. Commissioner, 123 T.C. 213, 217-218 (2004); Swain v. Commissioner, 118 T.C. 358, 362-365 (2002). Petitioners also stipulated that the determinations in the notice of deficiency are correct.

Mr. Levitz (sometimes hereinafter petitioner) earned his law degree in 1984. During 2008 petitioner was a licensed attorney in the State of California operating his own legal practice, which he had owned and operated since at least 2003. Petitioners' son Abraham Levitz worked for his father's law firm in 2003 and 2004 and was paid modest wages. Abraham was in his mid-twenties during the relevant years and had little or no experience in the real estate field when he and petitioner began their real estate activities.

I.     Petitioner's and Abraham's Real Estate Activities Generally

Petitioner and Abraham became interested in real estate activities, and they began attending real estate classes and seminars together in 2003. Sometime before 2005 they purchased a condominium in "Winter Park"[3] which they remodeled and sold, a project which inspired them to seek out other real estate projects.

Before April 2005 petitioner and Abraham joined a real estate investment group in the San Francisco Bay area called the Bay Area Wealth Builders (BAWB), a group comprising people "in the business of real estate investing

---

[3]Petitioners and respondent also occasionally referred to a condominium called "Rohnert Park"; on the basis of this record, we conclude that Winter Park and Rohnert Park are the same property. There are no further details about this condominium in the record, including where it was, whether petitioners and/or Abraham purchased it, or when it was purchased and sold.

and acquisition", including real estate professionals and real estate investors. They would sometimes attend the BAWB monthly meetings. Petitioner and Abraham met Judy Miller at one of the BAWB meetings. Ms. Miller gave presentations to BAWB members about real estate investment opportunities, and she would seek investors and partners in various real estate activities.

Petitioner also attended and completed the following courses provided by the Certified Commercial Investment Member (CCIM) Institute:

- "Financial Analysis For Commerc[e] - H110600" on April 11, 2006;

- "Market Analysis for Commercial Investmen[t] - 12C2601" on November 3, 2006;

- "User Decision Analysis for Commercial Investment R" on February 20, 2008; and

- "Investment Analysis for Commercial Investment Real [Estate]" on May 14, 2008.

It is unclear whether petitioner or Abraham received any other formal training or education in real estate before or during the year in issue. During 2008 neither petitioner nor Abraham was licensed to deal in real estate.

Mr. Levitz and Abraham used the business names Global Real Estate Acquisitions Technologies, Inc. (GREAT), and Enrich Investments, Inc. (Enrich),

during the course of their real estate activities. GREAT was incorporated in 2004, and a bank account was opened in the name of the corporation. Sometime before May 2006 a bank account was opened on behalf of Enrich.[4] Mr. Levitz and Abraham did not file tax returns for GREAT or Enrich, nor did they hire employees for either entity or for the real estate activity.

In addition to the Winter Park condominium, petitioner and Abraham became involved in projects with six real estate properties. In 2004 and 2005 Abraham[5] signed purchase contracts for the following five condominiums in Florida: (1) 10295 Collins Unit 612; (2) 10295 Collins Unit 613; (3) Condo - Axis at Brickell; (4) 50 Biscayne Unit 4002; and (5) 50 Biscayne Unit 3309. We will collectively refer to these five condominiums as the Florida condominiums. Additionally, Ms. Miller had the idea to purchase a house in Florida known as 2400 Rocky Point and remodel it and sell it for a profit, and she solicited petitioners and Abraham to purchase and work on the property. In 2005 petitioners purchased 2400 Rocky Point for the purpose of remodeling and resale. We will collectively refer to these six properties as the Florida properties.

---

[4]Petitioner testified that he could not remember whether Enrich was a corporation or a sole proprietorship.

[5]Petitioners provided the funds for all payments for the five condominiums. We will discuss Abraham's role in further detail infra part II.

In addition to the real estate activities he shared with petitioner, Abraham worked independently on three real estate transactions between 2005 and 2008. Sometime after 2008 Abraham moved to Texas to work with Ms. Miller on other real estate activities. At the time of trial Abraham continued to work on various real estate activities in Texas. It appears that petitioner, who continued to live in California, abandoned his real estate activities after 2008.

## II. The Florida Properties

### A. The Florida Condominiums

As previously indicated, Abraham signed purchase contracts as buyer for the Florida condominiums in 2004 and 2005. Pursuant to these purchase contracts, initial deposits, determined as percentages of the purchase prices, were paid in two installments, and the contract was to be completed (and the remainder of the purchase prices paid) upon completion of the construction of the units. Petitioners paid or funded all deposits for the Florida condominiums, either from their personal bank account or from the Enrich or GREAT bank account.[6] Abraham signed the contracts to purchase the properties. The apparent plan was that the contracts would be assigned to petitioners at some point before each purchase contract was completed.

_____

[6]The Enrich and GREAT bank accounts were funded by petitioners.

Florida real estate prices were depressed in 2007 and 2008 as there were many more sellers than buyers in the marketplace. Petitioners did not have sufficient funds to complete the purchase contracts for four of the five condominiums, and they could not find buyers for the properties. These purchase contracts were abandoned in 2008, and petitioners forfeited approximately 75% of the deposits paid. The fifth condominium, 50 Biscayne Unit 3309, was sold in April 2008.[7]

B.   2400 Rocky Point

On April 15, 2005, petitioners acquired 2400 Rocky Point for a purchase price of $859,000, through a section 1031 exchange and cash. Petitioners also obtained a construction loan from SunTrust Bank to finance the remodeling of the property, initially borrowing $831,500 and later increasing this amount to $990,400. The remodeling of 2400 Rocky Point was a "massive project" that

---

[7]It is unclear from the record whether the purchase contract for 50 Biscayne Unit 3309 was completed. Pursuant to the purchase contract, the total purchase price for this unit was $201,900 and deposits totaling $40,380 were required to secure the contract. The record reflects that petitioners paid only the deposits. In any event, the parties stipulated that 50 Biscayne Unit 3309 was sold for $30,443 in 2008. It is also unclear whether Abraham ever assigned any of the purchase contracts for the Florida condominiums to petitioners before 50 Biscayne Unit 3309 was sold and or before the purchase contracts for the other Florida condominiums were abandoned. On the basis of this record, we conclude that the partial refunds for deposits on the Florida condominiums were paid to petitioners.

involved adding rooms to the house, upgrading the quality of the materials used in the building, updating the utilities, the roof, and the pier, and various other upgrades and improvements. Darlene Jones was the principal contractor for the 2400 Rocky Point project, and she was responsible for hiring and managing the subcontractors for the project.

Ms. Miller continued to have some involvement with 2400 Rocky Point, hiring a law firm, Methven & Associates (Methven), to provide legal advice and write some of the checks for various expenses related to the remodeling. Some of the correspondence relating to the 2400 Rocky Point project was addressed to Mr. Levitz "c/o Judy Miller".[8] Abraham believed that Ms. Miller had "some" control over decisions made on the 2400 Rocky Point project. Additionally, some of the checks written for the 2400 Rocky Point project were payable to Ms. Miller although the full extent of her involvement is not clear.

Abraham was "intimately involved" with the remodeling of 2400 Rocky Point, responsible for traveling to and inspecting the site, counseling petitioner, signing checks drawn on the Enrich bank account, discussing various matters

---

[8]Letters from SunTrust Bank relating to the construction loan and a letter from Staged Homes by Design (staging and furniture rental for 2400 Rocky Point) were sent to Mr. Levitz "c/o Judy Miller" and were addressed to a P.O. box in San Rafael, California. This appears to have been Ms. Miller's P.O. box.

related to the project with petitioner, and generally acting as petitioner's agent. Abraham would consult with petitioner before making decisions and communicating them to Methven, Ms. Miller, or Ms. Jones. Some of the correspondence relating to the 2400 Rocky Point project, including letters from SunTrust Bank about the construction loan, was addressed to Abraham. Abraham would also travel to Florida to visit the property approximately once a month. Additionally, sometime before the sale of 2400 Rocky Point Abraham acquired an ownership interest in the property, becoming a co-owner with petitioners.[9]

Remodeling of 2400 Rocky Point took longer than expected, extending at least through 2007. When petitioners and Abraham tried to sell the property in 2008 they had difficulty finding a buyer and eventually put it for sale at auction. In June 2008 they sold 2400 Rocky Point for approximately $1.1 million.

---

[9]Petitioners did not provide a clear explanation of Abraham's financial role in the 2400 Rocky Point project. On the basis of Abraham's modest income and his limited assets, and his role with respect to the Florida condominiums, it does not appear that he contributed financially to the purchase or remodeling of 2400 Rocky Point.

III.   Tax Return

Petitioners' 2008 Form 1040 was prepared by a certified public accountant and signed by petitioners on August 23, 2010.[10]  They reported the following taxable income:  (1) $99,278 in wages or salary,[11] (2) $1,338 in taxable interest, (3) $132 in taxable dividends, and (4) $3,629 in taxable refunds, credits, or offsets of State and local income taxes.

Attached to the 2008 Form 1040 was a Schedule C, Profit or Loss From Business, under the business name Levitz Legal Group, for Mr. Levitz's legal practice.  The Schedule C reported gross income of $56,010, including gross receipts or sales totaling $42,490 and other income totaling $13,520.  The Schedule C also reported total expenses of $100,782, including $8,770 for travel expenses, $18,329 for legal and professional services expenses, a $27,434 mortgage expense, and $8,526 for business use of a home expenses.  The resulting net business loss of $44,772 offset petitioners' wages and other taxable income.

---

[10]The record does not reflect when the return was filed although it appears that it was not timely filed.

[11]The record does not reflect who earned this wage or salary income.  The Court notes that in her request for relief from joint and several liability under sec. 6015 Mrs. Levitz asserted that she was a nurse and had been the primary breadwinner for the Levitz family since May 2005.  Thus it appears Mrs. Levitz earned this income.  We will discuss Mrs. Levitz's request infra part V.

The Schedule C for Levitz Legal Group did not report income or expenses from petitioners' real estate activities. Petitioners did not attach a separate Schedule C or Schedule E, Supplemental Income and Loss, relating to the real estate activities, under the business names for GREAT or Enrich or under any other name.

Petitioners also reported a capital loss of $3,000, attaching a Schedule D, Capital Gains and Losses, reflecting the disposition of their personal residence and the six properties in Florida as long-term capital gains and losses as follows:

| Property description | Date acquired | Date sold | Sales price | Cost or other basis | Long-term capital gain (loss) |
|---|---|---|---|---|---|
| 235 Broderick | 5/3/96 | 3/4/08 | $2,000,000 | $889,242 | $1,110,758 |
| Sec. 121 exclusion | | | | | (500,000) |
| Subtotal | | | | | 610,758 |
| | | | | | |
| Condo-Axis at Brickell | 2/7/05 | 6/12/08 | -0- | 65,380 | (65,380) |
| 2400 Rocky Point | 4/15/05 | 6/6/08 | 1,127,500 | 1,844,116 | (716,616) |
| 50 Biscayne Unit 3309 | 1/25/05 | 4/1/08 | 30,443 | 40,380 | (9,937) |
| 50 Biscayne Unit 4002 | 1/25/05 | 7/1/08 | -0- | 145,980 | (145,980) |
| 10295 Collins Unit 612 | 2/14/05 | 7/1/08 | -0- | 120,000 | (120,000) |
| 10295 Collins Unit 613 | 2/14/05 | 7/1/08 | -0- | 200,500 | (200,500) |
| Subtotal | | | 1,157,943 | 2,416,356 | (1,258,413) |
| | | | | | |
| Total | | | | | (647,655) |

The cost basis listed for each of the Florida condominiums was determined by the total amount of the deposits paid for each property.

Also attached to the 2008 Form 1040 was a Schedule A, Itemized Deductions, claiming total deductions of $62,445, including a deduction of $46,079 for a mortgage interest expense. Petitioners' 2008 Form 1040 reflected tax of zero, withholding of $11,304, an additional child tax credit of $1,000, a recovery rebate credit of $900, and an overpayment of $13,204.

IV.   Notice of Deficiency and Petition

In the notice of deficiency the Internal Revenue Service (IRS) determined that petitioners had failed to report $4,720 in taxable State income tax refunds and $1,180 in taxable interest income. The IRS disallowed deductions including the following:[12]   (1) $31,979 of the $46,079 mortgage interest expense claimed on Schedule A; (2) $16,830 of the $18,329 legal and professional expenses claimed on Schedule C; (3) the $8,770 travel expense claimed on Schedule C; and (4) the $27,434 mortgage interest expense claimed on Schedule C. The IRS also determined that petitioners were entitled to an additional deduction of $6,323 for business use of their home expenses. Respondent asserts in his opening brief that

---

[12]An additional adjustment to the deduction for medical expenses is computational and will be resolved by the Court's conclusion on the characterization of losses issue.

"[t]he notice of deficiency did not disallow the Schedule D capital losses as reported for 2008."[13]

On July 1, 2014, petitioners timely filed in a petition in which they did not dispute the determinations in the notice of deficiency; instead petitioners assert that Mr. Levitz "should be considered a real estate professional" and that the losses claimed on Schedule D "should be treated as ordinary losses".

V.    Mrs. Levitz's Request for Relief From Joint and Several Liability

On October 7, 2016, Mrs. Levitz submitted to the IRS a claim for relief from joint and several liability under section 6015.  The IRS granted Mrs. Levitz partial relief pursuant to section 6015(b) with respect to the disallowed Schedule C items.  Mrs. Levitz does not challenge this determination.

---

[13]The record with respect to this item is somewhat confused.  Although respondent asserts that the notice of deficiency did not make adjustments to petitioners' Schedule D, the notice of deficiency reflects that petitioners had a long-term capital loss of $124,042 and a "corrected carryover" of $121,042 (after application of the $3,000 capital loss limitation).  The notice of deficiency does not provide further explanation of this adjustment, and the parties did not address or clarify this issue.  As discussed infra note 18, since we conclude that petitioners are subject to the capital loss limitations for 2008, we need not consider and make findings with respect to the amount of the loss incurred in each of these transactions.

## Discussion

I.     Burden of Proof

In general, the Commissioner's determination set forth in a notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions and credits are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deduction or credit claimed. Deputy v. du Pont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must comply with specific requirements for any deductions claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. at 440. Taxpayers must also maintain adequate records to substantiate the amounts of items underlying any credits and deductions. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Pursuant to section 7491(a), the burden of proof as to factual matters shifts to the Commissioner under certain circumstances. Petitioners did not allege or otherwise show that section 7491(a) applies. See sec. 7491(a)(2)(A) and (B). Therefore, petitioners bear the burden of proof. See Rule 142(a).

II.     Treatment of Capital Assets Under Section 1221

Petitioners assert that (1) petitioner's 2008 real estate activities constituted a trade or business and (2) the Florida properties were held primarily for sale to customers in the ordinary course of trade or business, and thus they are entitled to ordinary loss treatment for the dispositions of the Florida properties. Respondent asserts that (1) petitioner was not in the trade or business of real estate, but rather was an investor in his real estate activities and thus the losses were properly deducted as long-term capital losses and (2) petitioners did not substantiate all of their claimed losses. The parties do not dispute that the acquisition or attempts at acquisition of the Florida properties were for the purpose of resale or that the properties were disposed of or the contracts abandoned in 2008.

Section 165(a) generally permits a taxpayer to claim as a deduction "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Losses from sales or exchanges of capital assets are allowed as deductions only to the extent prescribed in sections 1211 and 1212. Sec. 165(f). Under those limitations, a taxpayer must first offset capital losses against capital gains; if aggregate capital losses exceed aggregate capital gains, the taxpayer may deduct up to $3,000 of the excess against ordinary income. Sec. 1211(b). Capital

losses exceeding the section 1211(b) limitation may then be carried forward to subsequent tax years. Sec. 1212(b).

For a given tax year, if there is net gain from the sale or exchange of real property used in a trade or business and held for more than one year, see sec. 1231(b)(1), the Code provides that such gain "shall be treated as long-term capital gains", sec. 1231(a)(1). On the other hand, if there is a net loss from this type of property, that loss is treated as an ordinary loss. Sec. 1231(a)(2). To determine the character of the loss, we must determine whether the properties are capital assets. See sec. 1221; Ark. Best Corp. v. Commissioner, 485 U.S. 212, 223 (1988). A capital asset is defined by section 1221(a) as any "property held by the taxpayer", but under section 1221(a)(1) a capital asset does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".[14] The question of whether properties are capital assets is ordinarily a question of fact. See Austin v. Commissioner, 263 F.2d 460, 461 (9th Cir. 1959), rev'g T.C. Memo. 1958-71.

_____

[14]Sec. 1221(a)(1) also excludes from the definition of a capital asset "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year". Neither party ascribes special or independent significance to the statutory exception's reference to both inventory property and resale property; therefore, we do not analyze whether the Florida properties were inventory separate from the question of whether they were resale properties.

Facts showing that the taxpayer (1) operated a trade or business and (2) held the property in question primarily for sale as part of that trade or business are required for a determination that the property in question is not a capital asset. See sec. 1221(a)(1). Although the parties do not dispute that the Florida properties were held primarily for sale, the fact that petitioners acquired the properties for the purpose of resale by itself is not sufficient to establish that Mr. Levitz was in the trade or business of real property development and sale. Evans v. Commissioner, T.C. Memo. 2016-7, at *25; see also Buono v. Commissioner, 74 T.C. 187, 199-200 (1980).

The Court of Appeals for the Ninth Circuit[15] considers several factors to determine whether property is held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. Redwood Empire Sav. & Loan Ass'n v. Commissioner, 628 F.2d 516, 517 (9th Cir. 1980), aff'g 68 T.C. 960 (1977). These factors include (1) the nature and extent of the taxpayer's business, (2) the frequency and continuity of property sales over an extended period, (3) the extent and substantiality of the taxpayer's transactions, and (4) "the activity of the seller

---

[15]We apply the precedent of the Court of Appeals for the Ninth Circuit to which an appeal in this case would lie but for sec. 7463(b). See sec. 7482(b)(1); Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

[i.e., the taxpayer] about the property". See id.; Pool v. Commissioner, T.C. Memo. 2014-3, at *8-*9. In applying these factors we decide each case upon its particular facts, and the presence of any one or more of these factors may or may not be determinative. Redwood Empire Sav. & Loan Ass'n v. Commissioner, 628 F.2d at 517. We discuss the application of these factors below.

A.    The Nature and Extent of the Taxpayer's Business

The Code does not define the term "trade or business". To be engaged in a trade or business, "the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). "A sporadic activity, a hobby, or an amusement diversion does not qualify." Id. Whether a taxpayer's activities constitute the carrying on of a trade or business requires an examination of the facts and circumstances of each case. Id. at 36. The management of one's investments, no matter how extensive, is not a "trade or business." Whipple v. Commissioner, 373 U.S. 193, 200 (1963).

Factors indicating that the taxpayer conducted real estate activities in a systematic and businesslike manner support a finding that he was engaged in a trade or business. Norris v. Commissioner, T.C. Memo. 1991-648, 62 T.C.M. (CCH) 1652, 1656 (1991). The Court also considers whether the taxpayer

maintained books and records for that business.  <u>Evans v. Commissioner</u>, at *28;
<u>Norris v. Commissioner</u>, 62 T.C.M. (CCH) at 1656 .  The commingling of
personal and activity funds is not indicative of businesslike practices.  <u>See</u> <u>Dodds</u>
<u>v. Commissioner</u>, T.C. Memo. 2013-76, at *15; <u>Ballich v. Commissioner</u>, T.C.
Memo. 1978-497, 37 T.C.M. (CCH) 1851-40, 1851-46 (1978).

We conclude for a number of reasons that Mr. Levitz was not engaged in the
trade or business of buying and selling real estate.  First, there is nothing in the
record indicating that he engaged in the real estate activities with continuity and
regularity.  Petitioners did not provide any evidence or estimate about how often
Mr. Levitz would work on his real estate activities or how much time he devoted
to them, before or during the year in issue.  Additionally Mr. Levitz, a practicing
lawyer, continued to maintain an active legal practice in 2008.  In their pretrial
memorandum petitioners asserted that Mr. Levitz hired Abraham to work in his
law firm and to assist with the real estate activities because he was "busy with the
practice of law" during 2003, 2004, and 2005.  Although the record does not
reflect how much time Mr. Levitz devoted to his legal practice in 2008, he
reported gross receipts or sales totaling $43,490 and other income totaling

$13,520. Thus, it appears that he devoted at least a portion of his time to his legal practice.[16] See Commissioner v. Groetzinger, 480 U.S. at 35.

Further, it does not appear that Mr. Levitz and Abraham kept books and records in a manner consistent with a trade or business. At trial petitioners provided copies of checks and other documents reflecting the deposits paid for the Florida condominiums, including copies of a few emails from third parties confirming the payments, and copies of the purchase contracts. Petitioners also provided a binder with copies of hundreds of documents, mainly financial records, purchase and sale contracts, financial summaries, receipts, correspondence, and other documents related to the 2400 Rocky Point project (Rocky Point binder). The Rocky Point binder was disorganized and did not appear to be kept in a systematic and businesslike manner. Petitioners did not assert that they kept additional books or records for Mr. Levitz's real estate activities. Additionally, petitioners' failure to file a Schedule C or an income tax return for the real estate activities for 2008 is also not consistent with conducting the activity as a trade or

_____

[16]Although a taxpayer may be engaged in more than one trade or business at the same time, he has to demonstrate that he is engaged in each activity with continuity and regularity and show that on the basis of the facts and circumstances each activity is properly characterized as a trade or business. See Rule 142(a); Snyder v. Commissioner, 295 U.S. 134, 138-139 (1935); Finnegan v. Commissioner, T.C. Memo. 1997-486, 1997 WL 666968, at *3-*5, aff'd without published opinion, 168 F.3d 498 (9th Cir. 1999).

business.  See Evans v. Commissioner, at *28; Norris v. Commissioner, 62 T.C.M. (CCH) at 1656.

Additionally, Mr. Levitz and Abraham provided only vague details about the management of the real estate activities.  They did not hire any employees for their real estate activities.  It does not appear that they maintained an office for the real estate activities.[17]  With respect to bank accounts, Mr. Levitz testified that they opened bank accounts for GREAT and Enrich because "our mentors were always telling us to set up accounts for everything".  It is unclear from the record why some of the expenses for the Florida properties were paid from the GREAT and Enrich bank accounts while others were paid from petitioners' personal bank account.  See Evans v. Commissioner, at *28; Dodds v. Commissioner, at *15; Norris v. Commissioner, 62 T.C.M. (CCH) at 1656; Ballich v. Commissioner, 37 T.C.M. (CCH) at 1851-46.

Petitioners assert that Mr. Levitz's real estate activities were operated as a trade or business because Mr. Levitz and Abraham traveled around the country to

_____

[17]The Court notes that the checks for the GREAT bank account list a P.O. Box in Jackson, Wyoming, as the address and that the checks for the Enrich bank account list the address 530 Divisadero Street, 286, San Francisco, California. When counsel for respondent questioned petitioner about whether this San Francisco address was the office location for Enrich he testified:  "[I]t was the location where Enrich Investments, at that time, received its communications."

learn about various real estate markets, meet people in the field, and attend seminars. Mr Levitz testified: "I would say we collectively, with our travels and our education, we spent easily $35,000-$40,000 acquiring the knowledge that we did." Abraham testified that he and Mr. Levitz

> traveled to Florida extensively, as well as other states where seminars were being held and markets we were interested in * * * [w]e would get a sense of what the economy was doing, try to appreciate what median home prices were selling for * * * try to understand really what the real estate opportunity was, specifically in residential and then eventually commercial. We would meet with realtors and we would view properties and inspect them * * * [w]e would meet with local finance groups * * * we'd meet with title companies, realtors, as well as individuals selling property that were not realtors.

Neither Mr. Levitz nor Abraham provided further details about this education or travel. Other than their testimony about attending monthly BAWB meetings, the only evidence provided to show education or training in real estate is the copies of certificates Mr. Levitz earned for the CCIM courses. Mr. Levitz testified that the CCIM certificates "are earned after many hours of study and passing exams * * * [i]t's considered one of the highest types of credentials * * * in the commercial real estate field". He did not provide additional evidence to support this assertion or an estimate of how much he spent studying for the exams.

With respect to petitioners' assertions about travel for the real estate activities, the Rocky Point binder contains copies of some receipts and other documents with notes stating that a purchase was for "travel" relating to the "Florida investments", but petitioners did not provide testimony or other evidence to demonstrate the business purpose for any of these expenditures.

Petitioners also assert that Mr. Levitz had a brochure and website created to promote Enrich and offered into evidence a copy of the brochure and a printout of the website. The brochure is undated and describes the Enrich activity as "assisting the investor find and analyze real estate opportunities." Mr. Levitz testified that the website was created "around 2006." The printout of the website reflects that it was printed on January 27, 2009, and states under "Company" that "Enrich Investments strives to deliver the best in commercial real estate advice and acquisitions." Although these items indicate that Mr. Levitz had plans to market the Enrich activity, it is unclear from the record how much time was devoted to their creation and whether and to what extent they were used to promote the Enrich activity.

Mr. Levitz also testified that he intended to eventually abandon his legal practice and work on the real estate activities full time. The Court notes that

petitioners, when discussing the motivation for investing in the Florida properties, asserted in their pretrial memorandum that

> it was their dream to see their son Abraham succeed. He had expressed little interested in law, had decided not to go to college, but was * * * a willing ally in these real estate pursuits. [Petitioners] * * * were excited that they had found a common ground with Abraham and could possibly profit financially from real estate ventures while at the same time bolstering Abraham's interest in developing a real estate investment career.

Considering the facts and circumstances of this case, we conclude that Mr. Levitz did not engage in his real estate activities with continuity and regularity or conduct these activities in a systematic and businesslike manner. It appears that petitioners invested in the Florida properties with the intent of creating opportunities for Abraham to develop a career in real estate. This factor weighs against petitioners.

B.    The Frequency and Continuity of Property Sales

Factors indicating that a taxpayer engages in regular (rather than isolated or sporadic) sales of property support a finding that the taxpayer is engaged in a trade or business. Evans v. Commissioner, at *26; see, e.g., Ayling v. Commissioner, 32 T.C. 704, 709 (1959) (13 sales over four years did not establish frequency of sales characteristic of a business); Bennett v. Commissioner, T.C. Memo. 2012-193, 2012 WL 2865879, at *6 (one sale over five years did not establish frequency

of sales characteristic of a business); Nadeau v. Commissioner, T.C. Memo. 1996-427, 1996 WL 530110, at *4 (two sales over three years did not establish frequency of sales characteristic of a business).

The record reflects that petitioners and/or Abraham acquired two properties, the Winter Park condominium and 2400 Rocky Point, and signed five purchase contracts for the Florida condominiums. Of these seven properties, three were sold and four purchase contracts were abandoned. It does not appear petitioners purchased or sold any real estate after 2008. We conclude that petitioners engaged in sporadic, and not regular, sales of property over a period of several years. See Ayling v. Commissioner, 32 T.C. at 709; Evans v. Commissioner, at *26; Bennett v. Commissioner, 2012 WL 2865879, at *6; Nadeau v. Commissioner, 1996 WL 530110, at *4. We conclude that this factor weighs against petitioners.

C.    The Extent and Substantiality of Transactions

Here the Court considers whether the real estate transactions were bona fide, arm's-length transactions. Pool v. Commissioner, at *20-*23. The Court also considers whether the taxpayer's real estate transactions generate income and whether those transactions are the taxpayer's primary source of income. Evans v. Commissioner, at *29.

Respondent does not dispute that the dispositions of the Florida properties were bona fide, arm's-length transactions and that petitioners intended to make a profit on the resale of the properties. See Pool v. Commissioner, at *20-*23. But the record reflects that the real estate transactions did not generate income and were not petitioners' primary source of income. Mr. Levitz testified that petitioners spent "almost all of [the] money that we had saved up to that point" on the Florida properties and that when they realized losses "it was a hardship, it caused a lot of contention and bad feelings in the family". Additionally, it appears that Mrs. Levitz's wage or salary income was the primary source of household income and that Mr. Levitz also earned some income from his legal practice. Further, although petitioners assert that Mr. Levitz and Abraham successfully remodeled and sold the Winter Park condominium, nothing in the record reflects the amount of net gain on the sale. We conclude that this factor is neutral.

D.    The Activity of the Seller About the Property

This factor relates to the steps that the taxpayer undertook to sell the property. Evans v. Commissioner, at *29; see also Bennett v. Commissioner, 2012 WL 2865879, at *7; Nadeau v. Commissioner, 1996 WL 530110, at *4.

With respect to the Florida condominiums Mr. Levitz testified: "[W]e tried at several times to sell the properties, and couldn't find a buyer". With respect to 2400 Rocky Point he testified: "[B]y the time it finished we couldn't get a buyer * * * get anyone to purchase it, and eventually it had to be put up for auction and * * * a buyer was able to come along and buy it for a fraction of what was put into the property, around $1 million."

Considering the state of the real estate market at the time, we find credible Mr. Levitz's assertions that it was difficult to sell the Florida properties in 2007 and 2008. But apart from Mr. Levitz's vague testimony, petitioners made virtually no showing about their efforts to sell their properties; they did not testify or provide other evidence about the nature of their efforts to sell any of the Florida properties, such as advertising efforts or the amount of time committed to this activity. See Evans v. Commissioner, at *29; Bennett v. Commissioner, 2012 WL 2865879, at *7; Nadeau v. Commissioner, 1996 WL 530110, at *4. We conclude that this factor is neutral.

E.     Conclusion

Our analysis of the foregoing factors leads us to conclude that Mr. Levitz's real estate activities did not constitute a trade or business. See Redwood Empire Sav. & Loan Ass'n v. Commissioner, 628 F.2d at 517; Pool v. Commissioner, at

*8-*9. Thus, the Florida properties or interests therein were not held by petitioners in the ordinary course of a real estate trade or business and therefore were capital assets in their hands. See sec. 1221(a)(1); Evans v. Commissioner, at *25; Buono v. Commissioner, 74 T.C. at 199-200. Therefore, petitioners may deduct only $3,000 of their losses incurred with respect to the real estate activity against ordinary income and can carry forward the excess losses to subsequent tax years.[18] See secs. 165(f), 1211(b).

## III. Passive Activity Loss Under Section 469

Petitioners also assert in the alternative that Mr. Levitz is a real estate professional pursuant to section 469. Respondent asserts that petitioners did not meet their burden of proving that Mr. Levitz materially participated in his real estate activities and thus Mr. Levitz is not a real estate professional.

Section 469 is a loss disallowance provision, and as such does not affect the character of gain or loss. We have concluded that the reported losses are capital losses under section 1221; thus, even if we were to conclude that petitioner was a

---

[18]As indicated supra note 13, it is unclear from the record whether the notice of deficiency adjusted the amount of petitioners' capital loss carryforward for 2008. The amount of capital loss carryforward respondent allowed does not affect the amount of petitioners' deficiency for the year in issue. In any event, because of our holding herein, petitioners are entitled to deduct only $3,000 against ordinary income for 2008.

real estate professional, section 469 would not operate to recharacterize the capital losses as ordinary losses.

IV.   Conclusion

Since we hold for respondent and conclude that petitioners are not entitled to ordinary loss treatment for the losses on the Florida properties, we need not and do not address the issue of substantiation.

We have considered all of the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing and on account of the partial relief from joint and several liability under section 6015 granted to Mrs. Levitz,

Decision will be entered

under Rule 155.